Drexelbrook Associates, Appellant, *v.* Pennsylvania Public Utility Commission.

122

Argued September 15, 1964. Before ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (RHODES, P. J., absent).

*Irving R. Segal,* with him *Guy G. deFuria, Harold B. Bornemann,* and *deFuria, Larkin & deFuria,* and *Schnader, Harrison, Segal & Lewis,* for appellant.

*Daniel F. Joella,* Assistant Counsel, with him *Joseph C. Bruno,* Chief Counsel, for Pennsylvania Public Utility Commission, appellee.

OPINION BY ERVIN, J., December 31, 1964:

The order of the commission refusing the transfer of gas, electric and water facilities denies appellant, Drexelbrook Associates, rights to which it is clearly entitled under the existing law, and constitutes an abuse of discretion by the commission.

The record in this case shows there are many instances where landlords and owners of large apartments and office buildings purchase utility service on a wholesale basis and furnish such service to their office or apartment tenants. Appellant's Exhibit No. 5 lists a large number of apartment houses and developments where single point metering of electric, gas and water service is furnished the landlord by the utilities. Included among these are the Presidential Apartments, Rittenhouse Claridge, Rittenhouse Savoy, in Philadelphia, and Lynnewood Gardens in Montgomery County, the latter containing 1,796 apartment units compared to appellant's 1223 apartments.

It is evident that the owner of a clearly defined apartment house development, by furnishing gas, electricity and water exclusively to tenants is not a public utility, subject to commission jurisdiction, under §2, subsections 17(a) and (b) of the Public Utility Law, 66 PS §1102. The reason for this is that the landlord is not furnishing service "to or for *the public* for compensation" (emphasis supplied) within the meaning of the statute. Drexelbrook is a private, as opposed to a public, enterprise, and its facilities are available only

to tenants of Drexelbrook. The commission erred in holding that the proposed transfer would constitute appellant a public utility subject to commission jurisdiction, and that appellant had the burden of proving it would not be a public utility in rendering such services to its tenants.

The opinion of Judge WATKINS errs in assuming that the transfer of the physical facilities here involved would remove a segment of the *general public* from the jurisdiction of the commission. The tenants of appellant are not part of the general public served by the utility, but rather are a well defined and exclusive group, clearly distinguishable and removed from the general public. As Chairman Sharfsin said in his dissenting opinion, "The community consists of tenants and tenants only."

The law is settled that where service is rendered not to the general public, but to a defined and exclusive group, including tenants, such service is private in nature and not subject to commission jurisdiction: *Overlook Development Co. v. P.S.C.,* 101 Pa. Superior Ct. 217, 225, affirmed per curiam, 306 Pa. 43, 158 A. 869; *Borough of Ambridge v. P.S.C.,* 108 Pa. Superior Ct. 298, 306, 165 A. 47. In *Aronimink Transportation Co. v. P.S.C.,* 111 Pa. Superior Ct. 414, 170 A. 375, this Court ruled that a corporation owning 288 apartments and furnishing bus transportation to some 800 tenants was not a public utility by virtue of the bus service to a large number of tenants, but rather a private service which did not embrace all members of the public, nor did such service make the private corporation a common carrier. We there held, at page 419, that the service rendered tenants was "merely incidental to the main business of maintaining the apartment houses." Whether or not appellant would be a public utility is determined not by the landlord and tenant relationship, but by the character and extent of the service.

If the facilities here involved had been originally installed by the landlord under single metering and wholesale rates granted to the landlord by the utilities, there would be no doubt of the validity of the transaction. As the record in this case shows, such operations exist today in many large apartment buildings in Pennsylvania. The circumstance that the landlord now seeks single meter and wholesale rates should make no difference in the result. What is legal in one case does not thereby become invalid in the other. The sequence of events should not be controlling.

It is important to note there was no opposition to the proposals of the gas, electric and water companys to transfer facilities to the appellant landlord and give it the benefit of single meter service. Letters of consent were obtained from all tenants in which the landlord agreed to charge the same rate to the tenant as the utility charged the tenant. The petitioning utilities entered into specific contracts with the appellant whereby the appellant would maintain distribution facilities to tenants and receive from the utilities the benefit of wholesale and single meter rates.

While commission approval of the transfer of the facilities here involved may have been necessary, under §202(e) of the Public Utility Law, 66 PS §1122, the commission erred in holding the transferee would become a utility and would be required to seek "Commission authorization to furnish the public utility services now performed by applicants. . . ." Nor, from a realistic standpoint, would the applicant utilities be required to seek commission approval, under §202(d), 66 PS §1122, for "abandonment of service" to Drexelbrook tenants, as the commission implies. Service is not here being abandoned by the utilities, but simply continued on a different basis. In any event, all parties consented to the changeover, and the commission cannot arbitrarily withhold its approval in this case.

The commission order in this case deprived appellant of the benefit of wholesale rates to which it is entitled under the published tariffs of the petitioning utilities. Rule 13.1 of the electric and gas tariffs reads as follows: "Resale of Service: A Customer may resell energy [gas] purchased from the Company under a single contract at one application of an available rate when the purchased energy . . . is the exclusive source of the Customer's supply, is for the total requirements of the premises served, and the location and use of the resold energy conforms to the availability requirements of the Tariff for supply to Customer for his own account." In *Pa. P.U.C. v. Phila. Elec. Co.*, 23 Pa. P.U.C. 320, the commission approved the resale and submetering of electric current by a landlord of an office building to tenants.

As regards water facilities, the right of appellant to single point water meter service is especially clear. Appellant proposes to furnish water service to tenants free, i.e., as part of the rent, in the same manner as it has in the past. In *Phila. Suburban Water Co. v. Pa. P.U.C.*, 164 Pa. Superior Ct. 320, 64 A. 2d 500, this Court affirmed an order of the Commission that an apartment development, known as Colonial Gardens, and consisting of some 186 units in 11 buildings, was a "commercial" consumer and entitled to single point water meter service.

The fact that many of the apartment house developments do not submeter the electricity or gas furnished tenants is, also, not controlling. Appellant should not be penalized because of the sequence of events or because submetering places their rental charges for gas and electricity on a more equitable basis. The commission retains jurisdiction over the rates charged appellant by the producing utilities. The tenants are protected from unreasonable charges under their contracts with appellant. As a practical matter, the rates charged the tenants are geared to the rates charged the

landlord, whose main business is renting space. Economic competition in this field would prevent the landlord from making any unconscionable profit from utility charges.

The proposed transfers were sought by all parties, viz., the utilities, the landlord and all the tenants, and were unopposed. The approval of the transfers by the commission would not make appellant a public utility nor would it contravene any public policy against such transfer. On the contrary it would permit appellant to utilize provisions in the tariffs of the utilities setting up wholesale rates and single point service. To uphold the order of dismissal in the present case would mean that the commission must take jurisdiction and issue complaints against the owners of hundreds of apartments and office buildings in the Commonwealth, where the landlords are supplying gas, electric and water service to their tenants. As indicated by the cases, the law is that such transactions are valid under existing tariff provisions. The proposed transfers would clearly be legal, and not contrary to the public interest.

In refusing the transfers the commission acted on a mistaken view of the law, and abused its discretion. Cf. *Chemical Tank Lines, Inc. v. Pa. P.U.C.*, 193 Pa. Superior Ct. 607, 165 A. 2d 668, affirmed per curiam, 406 Pa. 359, 178 A. 2d 698. The order of the commission should be reversed and the record remitted with instructions to grant the applications, and issue appropriate certificates of public convenience to the utilities.

I concur in the certification of the case to the Supreme Court.

FLOOD, J., joins in this opinion.

---

OPINION BY WRIGHT, J.:

It is my view that the legislature did not intend to include service to tenants in its definition of service

to the public. The proposal by Drexelbrook Associates to provide service to this limited and exclusive group does not make it a public utility. I would reverse the order of the commission, and direct it to grant the applications.

OPINION BY WATKINS, J.:

An order of the Public Utility Commission dated August 19, 1963 denied the applications of Philadelphia Suburban Water Company and the Philadelphia Electric Company that sought approval pursuant to §202(e) of the Public Utility Law, 66 PS §112(e), of the transfers by sale to Drexelbrook Associates, the appellant herein, of the applicants' water, electricity and gas distribution, service-supply and metering facilities serving the development located on land owned by the appellant at Drexel Hill in Upper Darby Township, Delaware County, Pennsylvania.

Both applicants are public utility companies. The appellant is a registered limited partnership, a real estate holding and management organization which owns and manages "Drexelbrook", a garden type apartment village located on approximately 137 acres of land, consisting of ninety buildings, containing 1223 residential units, 9 retail stores, various public areas and a club with a dining room, swimming pool, skating rink and tennis courts.

This case was instituted by petitions of the applicants as stated hereinabove. The applications were dismissed, without hearing, on August 19, 1963 by the Commission which held: "Consideration having been given to the matters presented by these applications, the Commission is of the opinion and finds that such applications are of a unilateral nature and fail to embrace matters relating to the acquisition of public utility facilities by Drexelbrook Associates, a non-utility entity, or the resulting public utility status of said

transferees and the pre-requisite approvals attendant thereto."

The appellant then petitioned the Commission to reopen for the purpose of a further review of the record with leave to the appellant to intervene in the proceedings and have the opportunity to offer evidence in support of the applications. This petition was granted and, after hearing, the Commission again dismissed the applications on June 8, 1964, holding that the original order was not improper or in error but that the services proposed to be rendered for profit by the appellant were public utility services and subject to the Public Utility Law so that the appellant was not qualified as a transferee under §202(e). These appeals followed. The applicants did not appeal.

In its brief and at oral argument the intervenor appellant before the Commission stated the sole issue to be as follows: "Whether the intervenor, Drexelbrook Associates, by distributing or furnishing gas, electricity and water to its tenants, and no others, would become subject to the provisions of the Public Utility Law as a 'public utility' rendering service 'to or for the public for compensation' within the definition in subsections 17(a)(b) of §2 of the Public Utility Law."

The appellant on appeal here states the question to be: "Whether the owner of a clearly defined apartment house development, by furnishing gas, electricity and water exclusively to its tenants, would become subject to the provisions of the Public Utility Law as a 'public utility' rendering service 'to or for the public for compensation.' ".

What is being asked for in these applications is not just the transfer of the physical plant from the public utilities to a private nonutility entity, but also the transfer of the applicants' customers living in the development, a segment of the public subject to the juris-

diction of the public utility commission to private ownership and service not subject to the jurisdiction of the Public Utility Commission.

Article 1, §2, subsection 17 of the Public Utility Law, Act of May 28, 1937, P. L. 1053, 66 PS §1102, includes within the definition of "Public Utility", "persons or corporations now or hereafter owning or operating in this Commonwealth equipment, or facilities for: (a) Producing, generating, transmitting, distributing or furnishing natural or artificial gas, electricity . . . to or for the public for compensation; (b) Diverting, developing, pumping, impounding, distributing or furnishing water to or for the public for compensation; . . . .

"The term 'public utility' shall not include (a) any person or corporation, not otherwise a public utility who or which furnishes service only to himself or itself; or (b) any bona fide cooperative association which furnishes service only to its stockholders or members on a nonprofit basis; or (c) any producer of natural gas not engaged in distributing such gas directly." The Commission is the instrumentality created by the legislature to act as its agent in seeing to it that the public is furnished with adequate service at reasonable rates.

Section 202(e), supra, provides: "Upon approval of the commission, evidenced by its certificate of public convenience first had and obtained, and upon compliance with existing laws, and not otherwise, it shall be lawful: (e) For any public utility, except a common carrier by railroad subject to the Interstate Commerce Act, to acquire from, or to transfer to, any person or corporation, including a municipal corporation, by any method or device whatsoever, including a consolidation, merger, sale or lease, the title to, or the possession or use of, any tangible or intangible property used or useful in the public service: . . . ."

Section 203, 66 PS §1123, provides, inter alia, that: "A certificate of public convenience shall be granted by order of the Commission, only if and when the Commission shall find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience or safety of the public; . . ."

At the time the applications were filed for the transfer of the facilities to the appellant all the tenants of the development were being supplied with service as customers of the public utility companies. The utility rights and obligations of these customers were regulated by the Public Utility Commission. They were clearly a part of the indefinite public and not privileged individuals not subject to regulation. *Overlook Development Co. v. P.S.C.*, 101 Pa. Superior Ct. 217 (1931), affirmed per curiam, 306 Pa. 43, 158 A. 869 (1932). At the time of the application the facilities were private property devoted to the public service and impressed with a public interest. *Pittsburgh v. Pa. P.U.C.*, 165 Pa. Superior Ct. 519, 69 A. 2d 844 (1949).

The grant of these applications would remove the tenants from being a segment of the public and from the regulating protection of the Commission. Their only protection as privileged individuals would be the commitment of the appellant that the rates and charges shall not exceed the amount the tenants would have to pay if the services were furnished by the applicants and they have only the commitment of the appellant as to the rendition of service and repairs. The jurisdiction of the Commission would end with the transfer and the only remedy for complaints upon which the tenants could rely according to the dissenting opinion of Chairman Sharfsin, of the Commission, was the general law of estoppel, Section 90, Restatement of Contracts, Promissory Estoppel.

The Commission, however, is the instrumentality created by the legislature in the exercise of the police power, to act as its agent, in seeing to it that the public is furnished with adequate service at reasonable rates. *D. F. Bast, Inc. v. Pa. P.U.C.,* 185 Pa. Superior Ct. 487, 138 A. 2d 270 (1958). The Commission should be reluctant to relinquish jurisdiction of the rates and, services furnished to a segment of the public as a matter of public policy. The granting of petitions such as these could well funnel the cream of utility business out from under regulation so that rates and services might be seriously affected for those remaining under regulation by the Commission.

The appellant obtained cards from the tenants indicating their acceptance of the suggested transfer of utility facilities. A copy of the letter sent by the appellant to the tenants reads as follows:

"March 8, 1963

Dear Tenant:

We expect to assume responsibility for the furnishing of your present gas and electric service before May 1, 1963.

Since you now have a separate service contract with Philadelphia Electric Company, we would appreciate it if you would sign and return the enclosed post card as soon as possible.

When the change-over is made, you will be billed by Drexelbrook Associates at the exact same rate which Philadelphia Electric Company would charge for the same service.

Very truly yours,<br>DREXELBROOK ASSOCIATES"

A copy of the post card enclosed in the appellant's letter to the tenants which they were asked to return to

the appellant after indicating their acceptance or non-acceptance, reads as follows:

"March 8, 1963

We have received notice of the change from separate to central point metering for gas and electric service and hereby authorize Philadelphia Electric Company to cancel our gas and electric service contracts at the time the change-over is made and to give Drexelbrook Associates information as to our former use of gas and electricity.

Address: ...........................
Apartment No. .............
Street ..........................."

There was a similar notice and authorization in regard to the water supply.

Even if we were to assume for the purpose of this argument that this correspondence constitutes proof of an agreement by the tenants-consumers that service by the applicants be discontinued and constitutes a waiver of regulation by the Commission, we do not believe that the right of regulation prescribed by the legislature in the exercise of the police power for the public good can be bargained away or waived by a collateral agreement entered into by the customer. *Relief Electric L. H. & P. Co.'s Petition*, 63 Pa. Superior Ct. 1 (1916). The creation of the Commission was not only to curb unbridled competition among several companies but also to protect the public from bad service and unfair and unreasonable rates.

"The general purposes of the act have been recognized as being within the grasp of legislative control. The authority of the legislature comes from its inherent right to exercise certain police powers as an inalienable function of government. This power, while most generally considered as being applicable to laws affecting health, morals and public safety, has, by ju-

dicial decisions, been extended to embody regulations such as expressed in the public service act; it has been held to include regulations for the comfort and convenience of the public, the common good as involved in the general prosperity, or the general public welfare: (Citing cases) . . . The underlying principle is that business of certain kind holds such a peculiar relation to the public interest that there is superinduced upon it the right of public regulation . . .". *Relief Electric L. H. & P. Co.'s Petition,* supra, at pages 5 and 6. It should be pointed out that even the exceptions set forth in §1122(e) are not applicable if the transfer of property involves the transfer of patrons.

In a landmark unemployment compensation case, *Gianfelice Unemployment Compensation Case,* 396 Pa. 545, 153 A. 2d 906 (1959), the Supreme Court held at page 554: "Where a statute of the Commonwealth expresses a public policy designed to alleviate a condition of possible distress among the public or a segment thereof and *explicitly proscribes waiver of the benefits of the act,* no private agreement, however valid between the parties, can operate as such a waiver." The proscription contained in the Unemployment Compensation Act is not contained in the Public Utility Law. However, the police power of the Commonwealth which has been delegated to the Commission as an agency of the legislature has been most frequently exercised with respect to health, safety and morals but it is the law that public service of any kind is subject to legislative control so far as it becomes necessary for the protection of public interest. The interest of the public here is not only to insure good utility service and fair and reasonable rates but to protect the health and safety of the people in the adequate supply of water, electricity and gas. It seems to follow that the Commission, in exercising its administrative discretion, not only may but should deny the transfer of patrons out

from under regulation, even where their consent has been obtained, in circumstances such as this case presents, in the public interest and as a matter of public policy.

The appellant contends that "it is common knowledge that a tremendous number of apartment houses and office buildings in Pennsylvania purchase utility service on a 'wholesale' basis and furnish such service in turn to their apartment or office tenants." The appellant admits however that in most cases they do not submeter the utilities but include the cost in the rent. There is no evidence in the record of this submetering and the Commission takes the position that a different situation exists where it is metered and where it is included in the rent.

We are not so naive as to believe that the cost of utilities are supplied free to the tenants; nor so naive as to believe that the landlord does not make a profit under such circumstances. We believe that the distinction made by the Commission between including the cost of utility service in a flat rental charge and submetering is a distinction without a difference and the question in this appeal does not turn on that fact. In the apartment house where the facilities were provided by the landlord there never was a dedication to public use nor were the facilities impressed with a public interest. The landlord was not a public utility and the service was not open to the indefinite public; but was confined to privileged individuals not subject to the Commission's jurisdiction. *Overlook Development Co. v. P.S.C.*, supra, at page 225. The applicants seeking the transfer in this appeal are public utilities who offered their services to the general public including the occupants of Drexelbrook.

In *Aronimink Transportation Co. v. P.S.C.*, 111 Pa. Superior Ct. 414, 170 A. 375 (1934), the apartment owner supplied his tenants with bus service between

the apartment building and a transportation terminal in his vehicles. The service was limited to the occupants of the apartment house and boarding or alighting from the bus must be at the apartment or the terminal. It carried a sign "Private Bus". It was held that the apartment owner was not engaged as a common carrier. Again, the equipment used by this apartment owner had never been dedicated to a public use nor the buses impressed with a public interest.

We agree with the Commission that it was not established as a matter of law that the approval of the proposed transfer of facilities and customers from the supervision of the Public Utility Commission is necessary or proper for the service, accommodation, convenience or safety of the public; and under the law and the facts, where, as here, the facilities have been dedicated to a public use and impressed with a public interest and where the issuance of the certificate would remove a segment of the public from the jurisdiction of the Commission and as a matter of public policy, the Commission did not commit an error of law in dismissing the applications on the ground that the transferee was not qualified as a public utility.

WOODSIDE and MONTGOMERY, JJ., join in this opinion.